IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NORTH CAROLINA
WESTERN DIVISION

| | | |
|---|---|---|
| ALLIANCE INTERNATIONAL, INC., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. 5:08-CV-00214-BR |
| | ) | |
| JAMES F. TODD, KATHY CARVER, | ) | |
| and ALLENA THOMPSON, | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

## PLAINTIFF'S RESPONSE TO DEFENDANTS' MOTION TO DISMISS

COMES NOW Plaintiff Alliance International, Inc. ("Alliance" or "Plaintiff") by and through its counsel, and respectfully files its Response to Defendants' Motion to Dismiss.

## INTRODUCTION

Alliance's Complaint pleads federal law claims under the Computer Fraud and Abuse Act ("CFAA") and a state-law claim for conversion. Both claims are premised upon the same allegation, which is that Defendants permanently deleted/destroyed information stored on Alliance computers. In addition to seeking damages for these alleged actions, Alliance requests injunctive relief pursuant to the CFAA. Given the nature of its claims, there is no question that this Court can assert federal question jurisdiction over Alliance's CFAA claims and supplemental jurisdiction over the state-law conversion claim.

Notwithstanding the above, Defendants desperately want to avoid litigating any claims before this Court, which is why they adopt an "everything but the kitchen sink" approach in their motion to dismiss memorandum ("Defs' Mem."). Specifically, Defendants ask the Court to (i) extend three different doctrines – the abstention doctrine; the Rooker-Feldman doctrine; and

North Carolina's claim-splitting doctrine -- well beyond their respective breaking points; and, in any event (ii) dismiss Alliance's claims on Rule 12(b)(6) grounds, even though there is no meritorious basis for doing so. For the reasons explained below, Defendants ask far too much. Accordingly, the Court should deny Defendants' motion to dismiss ("Defs' Motion") in its entirety.

## NATURE OF THE CASE

The three Defendants in this case – James Todd, Kathy Carver and Allena Thompson -- are former Alliance employees who presently work for Genesis Group Recruiting, LLC ("Genesis"). Following Defendants' resignations, Alliance filed two lawsuits in North Carolina Superior Court.

The first state court lawsuit, filed in November 2007, pleads state-law claims against Carver for breach of contract and tortious interference with prospective advantage. Alliance also seeks injunctive relief pursuant to these state-law causes of action. The second state court lawsuit, filed in January 2008, pleads state-law claims against Todd and Genesis for tortious interference with contract; tortious interference with prospective business advantage; misappropriation of trade secrets; breach of fiduciary duty; and unfair and deceptive trade acts. Alliance also seeks injunctive relief pursuant to the aforementioned state-law causes of action.

By May 2008, as part of an ongoing computer forensic investigation that commenced two months earlier, Alliance discovered evidence indicating that Todd, Carver and Thompson used a computer program (or other means) to permanently delete/destroy information contained on Alliance computers. Based upon this newly-discovered evidence, Alliance filed its Complaint in this Court pleading claims under the CFAA and a state-law claim for conversion. The Complaint

2

also seeks injunctive relief based upon Defendants' alleged CFAA violations. In response to Alliance's Complaint, Defendants filed the instant motion to dismiss.

## STATEMENT OF FACTS

### I.     BACKGROUND FACTS

Alliance, which began operations in 2003, recruits and places military veterans and candidates in private industry. (Compl., ¶¶ 10-11). John Todd, the brother of Defendant James Todd, is Alliance's founder and Chief Executive Officer. (Compl., ¶ 11).

John Todd hired James Todd as Alliance's Vice-President in July 2004, and promoted him to President in January 2005. (Compl., ¶¶ 12-13). As President, James Todd presided over the entire scope of Alliance's business development operations, including the supervision, control and maintenance of the company's client relationships. (Compl., ¶ 13). Thus, Todd was responsible for maintaining highly confidential business information relating to Alliance's client-employer contact information; client-candidate contact information; contact information for alumni placed in their positions by Alliance; and client leads. (Compl., ¶ 14). Todd stored all of Alliance's business development information on his company-issued computer. (Compl., ¶ 17). This information was not stored on any other computer and cannot be reproduced from any other source. (Compl., ¶ 19).

### II.    WHILE PRESIDENT OF ALLIANCE, JAMES TODD SECRETLY CREATES GENESIS AND PERMANENTLY DELETES CONFIDENTIAL BUSINESS INFORMATION FROM HIS ALLIANCE COMPUTER

Unbenownst to Alliance, while serving as Alliance's President, James Todd engaged in the following conduct:

- In August 2007, Todd purchased the domain name "genrecruit.com."

- In September 2007, Todd deleted more than 2,000 files from his Alliance computer.

- In October 2007, Todd used a software program called Net Eraser Trial to permanently delete all data stored on his Alliance computer. The Net Eraser Trial program also re-wrote the computer's memory to prevent the retrieval of any deleted-data.[1]

- In October 2007, Todd filed Articles of Organization with the North Carolina Department of the Secretary of State to form Genesis, a direct competitor of Alliance.

(Compl., ¶¶ 21-23).

On October 31, 2007, Todd abruptly and without notice resigned from Alliance. (Compl., ¶ 25). Following his resignation, Todd returned his company computer to Alliance. However, the computer contained no business contact information or any other proprietary information that was stored on the computer prior to it being issued to Todd. (Compl., ¶ 26). In fact, the only remaining information was the profile of an attorney who now represents Todd in Alliance's state court lawsuit. (Id.).

## III. JAMES TODD SOLICITS CARVER AND THOMPSON TO PERMANENTLY DELETE CONFIDENTIAL BUSINESS INFORMATION FROM THEIR ALLIANCE COMPUTERS AND TO ACCEPT EMPLOYMENT WITH GENESIS

Before and after his resignation, James Todd encouraged key Alliance personnel – including Defendants Carver and Thompson, who were Alliance's Business Development Managers – to leave Alliance and join Genesis. (Compl., ¶¶ 27-29). Carver and Thompson ultimately acceded to Todd's solicitations and became Genesis employees. (Id.). Prior to their resignations from Alliance (and in conjunction with Todd), Carver and Thompson assisted in permanently deleting/destroying client-contact and other proprietary information from their Alliance-issued computers. (Compl., ¶¶ 31, 54, 60).

## IV. ALLIANCE FILES LAWSUITS IN NORTH CAROLINA STATE COURT

After Todd, Carver and Thompson joined Genesis, Genesis controlled approximately ninety-five percent of Alliance's client-contact information. (Compl., ¶ 32). Todd then

---

[1] As explained infra, Alliance did not become aware of this fact until after filing its respective state court lawsuits.

demanded that Alliance pay him $30,000 per month to receive access to the information that he unlawfully acquired; otherwise, Genesis would actively solicit Alliance's clients and sabotage its business. (Id.). Alliance refused to comply with Todd's preposterous demands and instead filed lawsuits against him and others in North Carolina state court.

### A.    Alliance's State Court Lawsuit Against James Todd and Genesis

In January 2008, Alliance filed a complaint against James Todd and Genesis in North Carolina Superior Court (Case No. 08-CVS-0043). (Defs' Motion, Ex. 2). The complaint pleads the following state-law causes of action: (i) tortious interference with contract. Specifically, Alliance alleges that Todd/Genesis unlawfully interfered with an employment contract between Alliance and Kathy Carver by recruiting Carver to leave Alliance and join Genesis; (ii) tortious interference with prospective business advantage. Alliance alleges that Todd/Genesis unlawfully induced Alliance's current and prospective clients and candidates to refrain from contracting with Alliance; (iii) misappropriation of trade secrets. Alliance alleges that Todd misappropriated Alliance's trade secrets and used them to compete with Alliance; (iv) breach of fiduciary duty. Alliance alleges that while serving as Alliance's President, Todd breached his fiduciary duty by creating a competing business (Genesis); misappropriating trade secrets; and soliciting Alliance's employees and clients; and (v) unfair and deceptive trade acts in violation of N.C. Gen. Stat. § 75-1.1. The Complaint also seeks injunctive relief based upon the aforementioned state-law causes of action. (Id.).

In March 2008, the Superior Court granted Alliance's request for preliminary injunctive relief pursuant to state law. (Defs' Motion, Ex. 15). Todd and Genesis appealed this ruling and the North Carolina Court of Appeals stayed the preliminary injunction pending a hearing. (Defs'

Motion, Ex. 19). At present, the injunction proceeding remains pending on appeal while the underlying Superior Court action proceeds.

### B. Alliance's State Court Lawsuit Against Kathy Carver

In November 2007, Alliance filed a separate complaint against Carver in North Carolina Superior Court (Case No. 07-CVS-18955). (Defs' Motion, Ex. 3). The complaint pleads state-law causes of action for breach of contract and tortious interference with prospective business advantage. In addition, the complaint seeks injunctive relief pursuant to the aforementioned causes of action. (Id.). At present, Alliance's lawsuit against Carver remains pending with the Superior Court.

### V. AFTER FILING ITS STATE COURT LAWSUITS, ALLIANCE DISCOVERS THAT DEFENDANTS USED SOFTWARE AND/OR OTHER TOOLS TO PERMANENTLY DELETE/DESTROY INFORMATION CONTAINED ON ALLIANCE COMPUTERS

In March 2008, several months after filing its state court lawsuits, Alliance hired Capitol City Consulting, LLC ("Capitol City"), a computer forensic service, to determine if it could retrieve the information originally stored on James Todd's Alliance-issued computer. (Compl., ¶ 44). By May 2008, Capitol City's investigation (which remains ongoing) revealed that Todd used a program called "Net Eraser Trial" to (i) permanently delete/destroy all of the computer's files and information; and (ii) permanently overwrite the computer's memory so that such information can never be retrieved or reconstructed. (Compl., ¶ 45). Prior to hiring Capitol City, Alliance had no knowledge that such a program had been installed/used on Todd's Alliance-issued computer.

Capitol City's ongoing investigation also revealed that information and files were permanently deleted/destroyed from Carver's and Thompson's Alliance computers prior to their respective resignations. (Compl., ¶¶ 45, 52, 57).

I.    **DEFENDANTS' MOTION TO DISMISS SHOULD BE DENIED IN ITS ENTIRETY**

    A.    **This Court Should Not Voluntarily Waive Its Jurisdiction Pursuant To The Abstention Doctrine Set Forth in <u>Colorado River Water Conservation District v. United States</u>**

Defendants concede, as they must, that abstention is a rare "exception to the presumption that a federal court should exercise jurisdiction." (Defs' Mem., at 10). As explained below, Defendants provide no basis for invoking this rare exception here.

    1.    **Applicable Standards**

Both the United States Supreme Court and the Fourth Circuit have held "over and over . . . that in the usual case the federal courts *must* hear the cases that fall within their jurisdiction." McLaughlin v. United Virginia Bank, 955 F.2d 930, 934 (4th Cir. 1992) (emphasis in original) (citing Colorado River Water Conservation District v. United States, 424 U.S. 800, 817-18 (1976)). Consequently, "'abstention from the exercise of federal jurisdiction is the exception, not the rule' . . . [because] federal courts have a 'virtually unflagging obligation . . . to exercise the jurisdiction given them.'" Gannett Co., Inc. v. Clark Const. Group, Inc., 286 F.3d 737, 741 (4th Cir. 2002) (quoting Colorado River, 424 U.S. at 817); see also Vulcan Chemical Technologies, Inc. v. Barker, 297 F.3d 332, 340 (4th Cir. 2002) ("our dual system of federal and state governments allows parallel actions to proceed to judgment until one becomes preclusive of the other."). When a party asserts an abstention argument, the court's task "'is not to find some substantial reason for the *exercise* of federal jurisdiction . . . rather, the task is to ascertain whether there exist 'exceptional' circumstances, the 'clearest of justifications,' that can suffice under *Colorado River* to justify the *surrender* of that jurisdiction.'" McLaughlin, 955 F.2d at 934 (emphasis in original) (citation omitted).

7

Pursuant to the above principles, courts apply a two-part test in determining when abstention may be appropriate. Specifically, a court may abstain from exercising jurisdiction only if there are (i) parallel proceedings in state and federal court; *and* (ii) "exceptional circumstances" warranting abstention. See Gannett, 286 F.3d at 741 (quoting Colorado River, 424 U.S. at 813). To determine whether "exceptional circumstances" exist, courts in the Fourth Circuit apply a six-factor balancing test. See Section I.A.3., *infra*. Because abstention is the rare exception rather than the rule, the balance of these six factors must be "heavily weighted in favor of the exercise of jurisdiction." Id. at 744 (citation omitted).

**2.     Abstention Is Not Appropriate Here Because The State And Federal Court Proceedings Are Not Parallel**

The Fourth Circuit deems lawsuits to be parallel only in narrow circumstances. Indeed, "[t]he Fourth Circuit has been reluctant to find actions parallel where there is *any substantive difference* between the [state and federal] actions." R.J. Reynolds Tobacco Co. v. Market Basket Food Stores, Inc., No. 5:05CV253-V, 2006 WL 2417269, at *6 (W.D.N.C. Aug. 7, 2006) (emphasis added)[2]; see also McLaughlin, 955 F.2d at 935-36 (holding that state and federal lawsuits were not parallel because "[w]hile we agree that the federal and state actions have similar claims and draw on common events, *they are not totally duplicative*.") (emphasis added); National Textiles, L.L.C. v. Daugherty, 250 F. Supp. 2d 575, 577-78 (M.D.N.C. 2003) (holding lawsuits are not parallel if any of "the remedies sought and the legal theories advanced [in each lawsuit] differ.").[3] Applying the above principles, this lawsuit is not parallel to Alliance's state court lawsuits.

---

[2] A copy of this unpublished opinion is attached hereto as Attachment A.
[3] Defendants state that lawsuits are "parallel" if "substantially the same parties litigate substantially the same issues in different forums." (Defs' Mem., at 10). Even assuming the accuracy of this statement, the aforementioned cases confirm that the Fourth Circuit interprets the phrase "substantially identical" in an extremely narrow manner.

First, Alliance's claims here are distinct from those brought in Alliance's state court lawsuits. As a threshold matter, Alliance did not plead a federal CFAA claim or a state-law conversion claim in either of its state court lawsuits. For this reason alone, Alliance's state and federal lawsuits are not parallel. See R.J. Reynolds, 2006 WL 2417269, at *6 (holding state lawsuit was not parallel to federal lawsuit where "the federal action includes allegations of federal and state RICO violations and the [state] action does not.").

Moreover, the allegations supporting Alliance's CFAA and conversion claims – which are that Defendants permanently deleted/destroyed information from Alliance computers – are nowhere to be found in Alliance's state court complaints. This is because (i) Alliance did not discover that Defendants permanently deleted/destroyed information from its computers until *after* filing its state court lawsuits; and (ii) the claims pled by Alliance in state court are premised upon allegations that Todd and others misappropriated Alliance's confidential information and used it for Genesis' benefit. These facts further confirm that Alliance's federal and state court proceedings are not parallel.

Second, given the distinctions between Alliance's federal and state court claims, Defendants have no meritorious basis for asserting that "the issues raised in this case are substantially identical to the issues raised in the Pending State-Court Litigation." (Defs' Mem., at 11). Even worse, Defendants misstate the record in attempting to strengthen their argument on this point. Specifically, Defendants allege – without citation to the state court complaint against Todd – that Alliance's state court breach of fiduciary duty claim alleges that Todd "breached a fiduciary duty by allegedly using a computer erasure program to delete data on his laptop; in this action Alliance alleges that this same conduct forms the basis for a CFAA claim." (Defs' Mem., at 11-12). In fact, *no* such allegation appears in Alliance's state court complaint against Todd.

The specific allegations supporting Alliance's state court breach of fiduciary claim are against Todd are that he: (i) developed a plan to create and form Genesis as Alliance's direct competitor; (ii) misappropriated Alliance's confidential information for his and Genesis' benefit; and (iii) unlawfully solicited Alliance's recruiting candidates and clients. (Defs' Motion, Ex. 2, ¶ 57).

In short, the key issue to resolve here is whether Defendants used a computer erasure program (or other means) to permanently delete/destroy information from Alliance's computers. This issue does not need to be resolved in deciding the merits of Alliance's state court claims. Consequently, the issues raised in this proceeding are not parallel to the issues raised in the state court proceedings.[4]

Third, Defendants' assertion that "the *remedy* sought in this case is essentially the same as the remedy sought in the Pending State-Court litigation" simply is not correct. (Defs' Mem., at 12) (emphasis in original). Defendants' assertion is based entirely upon the general observation that Alliance seeks damages and injunctive relief in both the federal and state court proceedings. Thus, according to Defendants, this must mean that the remedies sought are sufficiently "parallel" for abstention purposes. Significantly, Defendants cite no case-law to support their overly simplistic position.

In any event, Defendants' assertion ignores the dispositive fact that in this case, Alliance seeks damages and injunctive relief against *different* parties, pursuant to *different* laws and for *different* reasons than those at issue in the state court proceedings. For example, Defendant Thompson is not even a party to the state court lawsuits.[5] Moreover, the injunctive relief sought

---

[4] Defendants observe that one of the claims at issue in the state court proceedings (misappropriation of trade secrets) shares a required element with Alliance's CFAA claim here; namely, that Defendants' actions must have been "unauthorized." (Defs' Mem., at 11). However, the observation that two distinct legal theories happen to share one common element (even if accurate) does not allow Defendants to leap to the conclusion that the federal and state court proceedings are "parallel" for abstention purposes. Defendants cite no case-law holding otherwise.

[5] Similarly, Genesis, a defendant in one of the state court actions, is not a defendant here.

against Kathy Carver in the state court proceedings is based upon allegations that she breached her employment agreement and tortiously interfered with Alliance's prospective advantage by contacting and soliciting Alliance clients. The injunctive relief sought against James Todd and Genesis in the state court proceedings is based upon similar allegations – i.e., that Todd (and, through Todd, Genesis) misappropriated trade secrets, used them in competition with Alliance and tortiously interfered with prospective business advantage as a result.

On the other hand, Alliance seeks injunctive relief here not pursuant to state law, but under federal law (i.e., the CFAA). Further, as explained supra, the relief sought in this action is based upon alleged wrongdoing that is separate and distinct from the alleged wrongdoing in the state court action.

Fourth, Defendants' assertion that there may be some factual overlap in litigating the claims at issue in the state and federal court proceedings lends no support to their abstention arguments. Court proceedings are not parallel simply because they have some "factual overlap." See National Textiles, 250 F. Supp. 2d at 577-78.

Finally, the lack of parallelism between Alliance's state and federal lawsuits is further evinced by the fact that (i) Genesis is not a party in this case (though it is a party-defendant in the state court proceedings); and (ii) Thompson is a party-defendant in this case (but is not a party in any of the state court proceedings).[6]

---

[6] The cases Defendants cite in support of their position (Defs' Mem., at 12) are inapposite because in each case (and unlike here); (i) the claims and factual allegations in the state and federal proceedings were identical; and/or (ii) the plaintiff(s) admitted that the claims and allegations were identical. See Covance Laboratories, Inc. v. Orantes, 338 F. Supp. 2d 613, 616-17 (D. Md. 2004) (plaintiff admitted that the action involved substantially the same parties and the state and federal actions involved "the same issues: both cases turn primarily on whether the restrictive covenant between Covance and Orantes is enforceable and reasonable in scope under Wisconsin law."); Eastern Associated Coal Corp. v. Skaggs, 272 F. Supp. 2d 595, 599 (S.D.W.Va. 2003) (plaintiff admitted that "[b]oth the state court case and [the federal] case involve the same dispute between the same parties."); Crawford v. Searles, No. 5:05-CV-261-02-MU, 2005 WL 2757256 (W.D.N.C. 2005) ("plaintiff's Complaint also plainly reports that he currently is

### 3.   There Are No "Exceptional Circumstances" Warranting Abstention

Even assuming, arguendo, that Alliance's federal and state lawsuits were parallel, there are no "exceptional circumstances" warranting abstention.  To determine whether "exceptional circumstances" exist, courts in the Fourth Circuit consider six factors: (i) jurisdiction over the property; (ii) inconvenience of the federal forum; (iii) the desirability of avoiding piecemeal litigation; (iv) the order in which jurisdiction was obtained; (v) whether federal law is implicated; and (vi) whether the state court proceedings are adequate to protect the parties' rights.  Id. (citation omitted).  As noted above, the balance of these six factors must be "heavily weighted in favor of the exercise of jurisdiction."  Id. at 744 (citation omitted).

The first and second factors support the exercise of jurisdiction here.  Defendants attempt to gloss over this fact by making the incomplete statement that the first two factors "are not implicated." (Defs' Mem., at 13).  Alliance agrees that the first two factors are not "implicated" insofar that (i) the North Carolina Superior Court has not assumed jurisdiction over any real property in Alliance's state court actions; and (ii) this Court is not an inconvenient forum for any party.  What this necessarily means (and what Defendants fail to state) is that, because the burden is on the Defendants to show why exceptional circumstances exist, these two factors weigh heavily against abstention.

The third factor (avoidance of piecemeal litigation) also supports the exercise of jurisdiction.  The only argument Defendants offer on this issue is the self-evident, speculative observation that there may be judicial inefficiency and a "risk of inconsistent judgments" if this

---

pursuing [identical] claims against these two defendants based upon these same facts in the North Carolina Industrial Commission.") (a copy of this unpublished opinion is attached to Defs' Mem.); United States for Use and Benefit of Arrow Concrete Co. v. Ohio Farmers Ins. Co., 981 F.Supp. 443 (S.D. W.Va. 1997) (court did not even discuss whether parallel actions existed, but analyzed only whether exceptional circumstances applied).

12

case is litigated at the same time as the state court lawsuits. (Defs' Mem., at 13).[7] However, the Fourth Circuit requires far more than that for the third factor to support abstention. See Gannett, 286 F.3d at 744 ("The threat of inconsistent results and the judicial inefficiency inherent in parallel [litigation], however, are not enough to warrant abstention.").

Because abstention is the rare exception and not the rule, the Fourth Circuit has held that the third factor only supports abstention if the "retention of [federal court] jurisdiction . . . create[s] the possibility of inefficiencies and inconsistent results *beyond those inherent in parallel litigation*[.]" Id. (citation omitted) (emphasis added); see also Gordon v. Luksh, 887 F.2d 496, 497-98 (4th Cir. 1989) ("Only in the most extraordinary circumstances . . . may federal courts abstain from exercising jurisdiction in order to avoid piecemeal litigation.").[8] Here, Defendants have offered *no* explanation (because there is none) for how this Court's retention of jurisdiction could potentially create inefficiencies beyond those inherent in parallel litigation. Consequently, the third factor weighs heavily against abstention.

The fourth factor (the order in which jurisdiction was obtained) does not weigh in favor of abstention or the retention of jurisdiction. Although Defendants note that some discovery has taken place in the state court proceedings (Defs' Mem., at 13), it is "well recognized that the pendency of an action in the state court is no bar to proceedings concerning the same matter in the Federal court having jurisdiction." Vulcan Chemical, 297 F.3d at 340 (quoting McLaughlin, 955 F.2d at 934).

---

[7] To bolster their position on this point, Defendants (again) wrongly state that the federal and state cases involve "the *same* parties, facts, remedy and discovery issues" and that Alliance "is seeking to litigate the same issue here, under the guise of the CFAA and conversion." (Defs' Mem., at 13) (emphasis added). As noted in Section I.A.2. supra, this proceeding involves claims and issues that are separate and distinct from those raised in Alliance's state court lawsuits.

[8] The third factor arguably may favor abstention in cases where the federal lawsuit contains no federal law claims or where a different state's law governs the resolution of claims brought in federal court. See Covance Laboratories, Inc. v. Orantes, 338 F. Supp. 2d 613, 618 (D. Md. 2004) (cited at p. 12 of Defendants' Memorandum). None of these factors is present here.

To strengthen their position on this factor, Defendants misrepresent the record by stating that it "may fairly be implied that this suit was filed as a 'contrived, defensive reaction' to Alliance's loss in the Court of Appeals" and that "Alliance was long ago well aware of the facts giving rise to this federal lawsuit[.]" (Defs' Mem., at 14). Contrary to Defendants' assertions, the record clearly shows that (i) the North Carolina Court of Appeals did not issue (and has not issued) any final judgment on Alliance's right to injunctive relief pursuant to its state court causes of action. In fact, no court has resolved *any* of Alliance's state court claims on the merits; (ii) Alliance did not become aware of the facts giving rise to its federal and state claims here until months *after* it filed its state court lawsuits; (iii) the injunctive relief sought here is pursuant to federal law (the CFAA) and is being sought for different misconduct than that alleged in Alliance's state court lawsuits; and (iv) Alliance has not even attempted to institute preliminary injunction proceedings in this Court pursuant to the CFAA.

The <u>fifth factor</u> (whether federal law is implicated) clearly favors the retention of jurisdiction. Defendants do not dispute this point, other than to weakly allege that this factor should be deemed "less important." (Defs' Mem., at 14).

The <u>sixth factor</u> (whether the state forum adequately protects the rights of the federal plaintiff) is neutral. Although Defendants allege that this factor favors abstention, their one-sentence, legally-unsupported "analysis" of this factor does not support their position. Moreover, courts analyzing this factor in the context of a CFAA claim have held that it "can only be a neutral factor, and one that weights *against*, and not for, abstention." <u>Thurmond v. Compaq Computer Corp.</u>, No. 1:99-CV-0711 (TH), 2000 WL 33795086, at *3 (E.D. Tex. Mar. 10, 2000) (emphasis in original).[9] This is wholly consistent with the United States Supreme Court's admonition that "the presence of state law and the adequacy of state proceedings can be used

___
[9] A copy of this unpublished opinion is attached hereto as Attachment A.

only in 'rare circumstances' to justify *Colorado River* abstention." <u>Gannett</u>, 286 F.3d at 746

(citing <u>Moses H. Cone Memorial Hospital v. Mercury Const. Corp.</u>, 460 U.S. 1, 26 (1983)).

In sum, the balancing of the relevant factors overwhelmingly supports the retention of

this Court's jurisdiction and shows that there are no "exceptional circumstances" warranting

abstention.

### 4. Defendants Cite No Controlling Or Persuasive Case-Law Otherwise Supporting Their Abstention Arguments

The cases cited throughout Defendants' memorandum consistently reiterate that

abstention is the rare exception and not the rule. Thus, it is not surprising that Defendants only

cite a miniscule number of cases from this Circuit where courts have abstained from exercising

jurisdiction pursuant to <u>Colorado River</u>. (Defs' Mem., at 12). However, none of these cases

involved facts that are even remotely similar to those present here. This explains why

Defendants ultimately focus upon inapposite case-law from outside this Circuit to support their

abstention arguments. In particular, Defendants assert that the district court's unpublished

decision in <u>Liebert Corp. v. Mazur</u>, No. 04 C 3737, 2004 WL 2095666 (N.D. Ill. Sept. 17,

2004)[10] supports their position. (Defs' Mem., at 14-15). For a number of reasons, Defendants'

assertion is without merit.

<u>First</u>, putting aside the fact that <u>Liebert</u> has absolutely no binding effect here, the <u>Liebert</u>

court applied a different (and, at times, incorrect) legal standard in addressing the abstention

issue. As a threshold matter, courts in the Seventh Circuit apply a ten-factor test – and not the

six-factor test referenced <u>supra</u> -- in determining whether there are "exceptional circumstances"

warranting abstention. More importantly, in considering the "avoidance of piecemeal litigation"

factor (a factor that is part of both the ten-factor and six-factor tests), the <u>Liebert</u> court concluded

---

[10] A copy of this unpublished opinion is attached to Defs' Mem.

that this factor strongly favored abstention. However, the sole basis for this conclusion was the court's belief that parallel proceedings would result in typical judicial inefficiencies. Significantly, the <u>Liebert</u> court gave *no* consideration (as required by Fourth Circuit law) to whether the "retention of [federal court] jurisdiction . . . create[s] the possibility of inefficiencies and inconsistent results *beyond those inherent in parallel litigation*[.]" <u>Gannett</u>, 286 F.3d at 744 (emphasis added). Had the <u>Liebert</u> court correctly employed the analysis mandated by the Fourth Circuit, it would have had to conclude that the "avoidance of piecemeal litigation" factor favored the retention of jurisdiction. This fact, in and of itself, renders <u>Liebert</u> wholly inapposite.

    <u>Second</u>, the facts of <u>Liebert</u> are markedly different from those here. In <u>Liebert</u>, the plaintiffs' federal court CFAA claim was premised upon the *same allegations* as plaintiffs' state court misappropriation of trade secrets claim. Specifically, plaintiffs' CFAA claims and state court claims alleged that defendants "took computer files with them upon resigning" and subsequently used them at their new employer. <u>Id.</u> at *1. The <u>Liebert</u> court held that abstention was warranted because "the two cases are based on the same facts." <u>Id.</u> That is clearly not the case here because Alliance's CFAA claims allege that Defendants *permanently deleted/destroyed* information from Alliance's computers. This allegation is separate and distinct from the allegations supporting Alliance's state court claims, which allege that Defendants *misappropriated* information stored on Alliance computers and used them for Genesis' benefit.

    <u>Finally</u>, the <u>Liebert</u> court's decision was premised in part upon the fact that the parties in the state court proceeding fully engaged in discovery; fully-briefed summary judgment motions; and the state court had already ruled on the parties' summary judgment motions. <u>Id.</u> at *3. In stark contrast, discovery only recently commenced in Alliance's state court proceedings and no

party has filed a dispositive motion. These facts further distinguish any potential impact that Liebert may have here.

**B.    There Is No Basis For Dismissing This Case Pursuant To The <u>Rooker-Feldman</u> Doctrine**

Defendants attempt to re-write the law in asserting that the <u>Rooker-Feldman</u> mandates the dismissal of this case. For this and other reasons, the Court should reject Defendants' <u>Rooker-Feldman</u> arguments.

**1.    Applicable Legal Standards**

The <u>Rooker-Feldman</u> doctrine "prohibits 'a party losing in state court . . . from seeking what in substance would be an appellate review of the *state judgment* in a United States district court, based on the losing party's claim that the *state judgment itself* violates the losers federal rights'." <u>Moore v. Idealease of Wilmington</u>, 465 F. Supp. 2d 484, 489 (E.D.N.C. 2006) (emphasis added) (quoting <u>Washington v. Wilmore</u>, 407 F.3d 274, 279 (4th Cir. 2005)). Thus, the doctrine can only apply if there is a final state court judgment on a particular claim. <u>See Davani v. Virginia Dept. of Transp.</u>, 434 F.3d 712, 718 n.6 (4th Cir. 2006) (noting that <u>Rooker-Feldman</u> doctrine was inapplicable in <u>Exxon Mobil</u> because "at the time Exxon filed its federal suit, the state court had not even reached a *final judgment* in the parallel state case.") (emphasis added); <u>Federacion de Maestros de Puerto Rico v. Junta de Relaciones de Trabajo de Puerto Rico</u>, 410 F.3d 17, 24 (1st Cir. 2005) ("<u>Exxon Mobil</u> tells us when a state court judgment is sufficiently final for operation of the <u>Rooker-Feldman</u> doctrine: when 'the state proceedings [have] ended.'") (citation omitted).

Moreover, the United States Supreme Court recently and substantially narrowed <u>Rooker-Feldman</u>'s scope. Specifically, the Court held that the doctrine is confined solely to cases "brought by state court losers complaining of injuries caused by state-court judgments rendered

before the district court proceedings commenced and inviting district court review and rejection of those judgments." Exxon Mobil Corp. v. Saudi Basic Indus. Corp., 544 U.S. 280, 284 (2005).

Applying Exxon, this Court has explained that for the Rooker-Feldman doctrine to even arguably be applicable, "[t]he relief sought in federal court must do more than upset the state court order; it must 'reverse or modify' the state court decree." Moore, 465 F. Supp. 2d at 489. Put another way, "Exxon requires . . . [that a court] examine whether the state-court loser who files suit in federal district court seeks redress for an injury caused by the state-court decision itself. If [the state court loser] is not challenging the state court decision, the *Rooker-Feldman* doctrine does not apply." Id. (quoting Davani, 434 F.3d at 718).

   2.   **Rooker-Feldman Is Inapplicable Because There Has Been No State Court Judgment And, In Any Event, Alliance's Federal Lawsuit Will Not Nullify Any State Court Judgment**

Defendants base their Rooker-Feldman argument solely upon the specious assertion that Alliance filed this lawsuit to "overturn" the North Carolina Court of Appeals' April 14, 2008 Order staying preliminary injunctive relief pending a hearing on the merits. (Defs' Mem., at 17). There are a host of problems with Defendants' argument.

First, the Court of Appeals' April 14, 2008 Order is not even a final judgment (or any type of judgment) on the merits of Alliances' state-law claim for injunctive relief. To the contrary, the Court of Appeals has not issued *any* ruling on the merits; rather, it has simply stayed preliminary injunctive relief pending a hearing. Following a hearing (which has yet to take place), the Court of Appeals may affirm, reverse or remand the trial court's grant of preliminary injunctive relief. Given the above, Defendants' Rooker-Feldman argument should be rejected because there has been no state court judgment for Rooker-Feldman purposes.

Second, an additional fatal flaw in Defendants' position is that Alliance requests injunctive relief in this case pursuant to a different law and for different reasons than those set forth in its state court lawsuits. A simple review of the pleadings shows that Alliance seeks injunctive relief here pursuant to a federal statute (the CFAA) and not state law (as Alliance does in its state court lawsuits). Moreover, unlike in its state court lawsuits, Alliance's CFAA claim for injunctive relief is based upon the allegation that Defendants permanently deleted/destroyed information from Alliance computers. Thus, even if the Court of Appeals' April 14, 2008 Order somehow constituted a "final judgment," Rooker-Feldman is nevertheless inapplicable because any merits rulings made by this Court clearly would not "overturn" that Order in any manner.

Finally, unlike in the state court lawsuits, Alliance has not even initiated proceedings before this Court to secure preliminary injunctive relief. Thus, even if there was a scintilla of merit to Defendants' Rooker-Feldman argument (which there is not), such an argument is premature at best.

### C.    There Is No Basis To Dismiss This Case Pursuant To North Carolina's Claim-Splitting Doctrine

As explained below, Defendants misapply the law in asserting that North Carolina's "claim splitting" doctrine warrants the dismissal of Alliance's claims.

#### 1.    Applicable Standards

It is well-established under North Carolina law that "[w]here a plaintiff has suffered multiple wrongs at the hands of a defendant, a plaintiff may normally bring successive actions." Bockweg v. Anderson, 428 S.E.2d 157, 161 (N.C. 1993) (citing Jackson v. Kearns, 117 S.E. 345 (N.C. 1923); Clothing Co. v. Hay, 79 S.E. 955 (N.C. 1913)). Consistent with the above, the North Carolina Supreme Court has held that the claim-splitting doctrine only applies when (i) a plaintiff brings the *same claims* in subsequent actions; *and* (ii) the state court has rendered a *final*

*judgment* in the earlier action.  See Bockweg, 428 S.E.2d at 164 (holding that the claim-splitting

doctrine only applies when the "final judgment in the prior [] court action . . . [raises the same

claim] now presented.").  Likewise, the North Carolina Court of Appeals has explained:

> [w]here the second action between two parties is upon the same claim, the prior
> judgment serves as a bar to the relitigation of all matters that were or should have
> been adjudicated in the prior action.  However, if the second action involves a
> different claim, "the prior judgment serves as a bar only as to issues actually
> litigated and determined in the original action."

Country Club of Johnston County, Inc. v. United States Fidelity & Guar. Co., 563 S.E.2d 269,

275 (N.C. App. 2002) (quoting Bockweg, 428 S.E.2d at 161).  See also Zapata Hermanos

Sucesores S.A. de C.V. v. Fein, No. 3:07-CV-441-RCM, 2008 WL 1944536 (W.D.N.C. April

30, 2008)[11] ("There is no claim splitting when two cases assert different claims against the same

defendant, especially when the plaintiff was not aware of the facts giving rise to the different

claims during the earlier of the two cases.") (citing Country Club, 563 S.E.2d at 275).

### 2.   North Carolina's Claim-Splitting Doctrine Is Inapplicable Under The Facts Present Here

Applying the above standards to the facts, North Carolina's claim-splitting doctrine

clearly is inapplicable here.  First, as already explained supra, there can be no legitimate dispute

that Alliance's federal court claims are separate and distinct from its state court claims.  For this

reason alone, any claim-splitting argument fails.

Second, Alliance did not become aware of the facts giving rise to its CFAA and

conversion claims until months *after* it filed its state court lawsuits.  This further confirms that

Alliance's claims here are different from its state court claims, thereby undercutting any potential

claim-splitting argument.  See Zapata, 2008 WL 1944536.

---

[11] A copy of this unpublished opinion is attached hereto as Attachment A.

Third, again for reasons already stated, there has been no final state court judgment in this case. Indeed, there has been no state court judgment on the merits of any Alliance's state court claims.

Finally, Defendants' claim-splitting argument, in effect, asks this Court to apply the claim-splitting doctrine in a "transactional" manner – i.e., that the claim-splitting doctrine should apply when a party brings a subsequent (but otherwise distinct) claim arising out of the same or similar transactions of an earlier claim. However, the North Carolina Supreme Court explicitly rejected this argument in Bockweg and instead made clear that the claim-splitting doctrine can apply only when a state court has issued a final judgment on identical earlier claims. As noted above, such facts clearly are not present here.

**D.      There Is No Basis For Dismissing Any Of Alliance's Claims Pursuant To Fed. R. Civ. P. 12(b)(6)[12]**

**1.      Rule 12(b)(6) Standard**

"In considering the propriety of a Rule 12(b)(6) dismissal, the standard of review is whether the complaint, accepting the allegations as true, allows a recovery." See Waterford Citizens' Ass'n v. Reilly, 970 F.2d 1287, 1290 (4th Cir. 1992) (citation omitted). Applying this standard to the pleadings here, Defendants' Rule 12(b)(6) arguments should be denied in their entirety.

**2.      The Complaint Unquestionably States Causes Of Action Under The CFAA**

**a.      Alliance Has Stated A Claim Under CFAA Subsection (a)(4)**

CFAA subsection (a)(4) grants parties the right to sue anyone who "knowingly and with

---

[12] Defendants filed an affidavit and a number of exhibits (consisting primarily of pleadings from Alliance's state court proceedings) with their motion to dismiss. To the extent Defendants rely upon these documents in support of their Rule 12(b)(6) arguments, the Court should convert Defendant's motion to dismiss into a summary judgment motion and otherwise apply the procedures set forth in Fed. R. Civ. P. 12(d).

intent to defraud, accesses a protected computer *without authorization, or exceeds authorized access*, and by means of such conduct furthers the intended fraud and obtains anything of value[.]" 18 U.S.C. § 1030(a)(4). Consistent with the CFAA's language, Alliance's Complaint clearly and repeatedly alleges that each Defendant violated the CFAA by permanently deleting/destroying information from Alliance computers without authorization or in excess of any prior authorization that they received from Alliance. (Compl., ¶¶ 24, 31, 53, 58, 62, 74). This indisputable fact should end the Rule 12(b)(6) analysis.

However, Defendants improperly make a summary judgment-type argument and assert that Alliance's CFAA claims must fail because "all of [the Defendants] were authorized to access the computers assigned to them at Alliance and the data stored on the computers." (Defs' Mem., at 20). This assertion, which disputes a factual assertion made in Alliance's Complaint, cannot be used to support Defendants' Rule 12(b)(6) arguments. Therefore, Defendants re-characterize this factual assertion into a legal one by offering an extended, inapposite recitation of how they interpret the phrase "without authorization, or exceeded authorized access" under the CFAA. (Defs' Mem., at 19-23). Specifically, Defendants assert that they technically were Alliance employees at the time they permanently deleted/destroyed information from Alliance computers; therefore, they somehow had Alliance's "authorization" to permanently delete/destroy the information. Consequently, according to Defendants, Alliance cannot plead any type of CFAA claim against them as a matter of law. For a number of reasons, this misguided "argument" is wholly without merit.

First, Defendants candidly admit that "there is no controlling authority" supporting their reading of the CFAA under the facts pled here. (Defs' Mem, at 20). For this reason alone, Defendants' argument should be rejected.

Second, to disguise the fact that no controlling authority supports their position, Defendants cite a number of inapposite cases and (incorrectly) claim that these cases support their argument. (Defs' Mem., at 20). However, none of these cases involved CFAA claims alleging that the defendant(s) used computer erasure software (or other means) to permanently delete/destroy information from company computers. Instead, they addressed misappropriation claims (such as those pled in Alliance's state court lawsuits) where the defendants were authorized to do what they did (i.e., access confidential information), even if they later copied and used confidential information for unlawful purposes after leaving employment. [13] In contrast, Alliance's CFAA claims allege that Defendants unlawfully and permanently deleted/destroyed confidential information from their computers.

Finally, that Defendants' position finds no basis in the law has been confirmed by those courts addressing CFAA claims under material identical facts to those pled here. For example, in Int'l Airport Centers, L.L.C. v. Citrin, 440 F.3d 418 (7th Cir. 2006), the employer's CFAA claim, like Alliance's claim here, alleged that (i) defendant-former employee received a company-owned computer for use at work; (ii) before the former employee resigned to start a competing business, he deleted all information contained on the computer; and (iii) prior to resigning, the former employee downloaded a secure-erasure program that permanently deleted/destroyed all information contained on the computer. Id. at 418-19.

---

[13] Defendants' cases also are distinguishable to the extent they (i) did not address CFAA claims; and/or (ii) involved other materially different facts than those pled here. See, e.g., In re America Online, Inc., 168 F. Supp. 2d 1359 (S.D. Fla. 2001) (did not involve employees); SecureInfo Corp. v. Telos Corp., 387 F. Supp. 2d 593 (E.D. Va. 2005) (dismissal was proper because plaintiff failed to plead lack of authorization in complaint); Sherman & Co. v. Salton Maxim Housewares, Inc., 94 F. Supp. 2d 817 (E.D. Mich. 2000) (analyzing the application of the SECA, not the CFAA); Educational Testing Service v. Stanley H. Kaplan, Educational Center, Ltd., 965 F. Supp. 731 (D. Md. 1997) (analyzing the SECA, not the CFAA); Am. Computer Trust Leasing v. Jack Farrell Implement Co., 763 F. Supp. 1473 (D. Minn. 1991) (analyzing the Electronic Communications Privacy Act, not the CFAA) (all cited at pp. 20-21 of Defs' Mem.). To make their cases appear more apposite, Defendants continue their pattern of misstating the substance of Alliance's federal court Complaint. For example, Defendants incorrectly state that "Alliance's real complaint here is that Defendants misused data or accessed it for an unauthorized purpose." (Defs' Mem., at 23). At the risk of belaboring the point, as noted supra, Alliance's federal Complaint plainly alleges that Defendants violated the CFAA by permanently deleting/destroying information from Alliance computers.

In reversing the trial court's dismissal of the employer's CFAA claims, the Seventh Circuit rejected the same CFAA arguments raised by Defendants here – i.e., that Defendants somehow were "authorized" to permanently delete/destroy information from Alliance's computers because they technically were Alliance employees at the time they deleted/destroyed the information. Applying a common-sense analysis, the Seventh Circuit held that the former employee's authorization to access his computer terminated "when, having already engaged in misconduct and decided to quit [the employer] in violation of his employment contract, he resolved to destroy [the computer's] files . . . in violation of the duty of loyalty that agency law imposes on an employee." Id. at 420 (citations omitted). As the Court further explained:

> [The former employee's] breach of his duty of loyalty terminated his agency relationship (more precisely terminated any rights he might have claimed as [the employer's] agent – he could not by unilaterally terminating any duties he owed his principal gain an advantage!) and with it his authority to access the laptop, because the only basis of his authorization had been that relationship.

Id. at 420-21 (citation omitted). The Seventh Circuit's decision is in accord with other courts' holdings that an employee acts without authorization and/or exceeds authorization by permanently deleting/destroying information from company computers. See ViChip Corp. v. Lee, 438 F.Supp.2d 1087 (N.D. Cal. 2006) (citing Citrin and holding that employee's deletion of information from company computer was "without authorization" under the CFAA); Forge Indus. Staffing, Inc. v. De La Fuente, 2006 WL 2982139 (N.D. Ill. 2006) (holding that an employee acts without authorization when deleting company information from a computer) (attached as Ex. 4); Nexans Wires S.A. v. Sark-USA, Inc., 319 F.Supp.2d 468 (S.D.N.Y. 2004) (same, though finding that plaintiff failed to establish sufficient monetary damages).

Although obviously not binding upon this Court, the Seventh Circuit's analysis in Citrin is fully applicable here. Similar to Citrin, (i) Defendants here purposefully and permanently

deleted/destroyed information from Alliance computers prior to their resignations to provide their new employer with a competitive advantage; (ii) Defendants clearly breached their duty of loyalty to Alliance through their myriad misconduct; and (iii) none of the Defendants otherwise had authority to permanently delete/destroy the confidential business information stored on Alliance's computers.

In sum, there is no question that the Complaint properly states a claim against each Defendant under CFAA subsection (a)(4).

**b.**      **The Complaint Otherwise States Valid Claims Against Defendants Carver and Thompson Under CFAA Subsection (a)(5)(A)(i)**

Defendants' make the puzzling assertion that the Complaint somehow fails to state claim against Carver and Thompson under CFAA subsection (a)(5)(A)(i). (Defs' Mem., at 23-24). This assertion, which merits little response, is wholly without merit.

As a threshold matter, Alliance's Complaint explicitly alleges that Carver and Thompson violated the CFAA by permanently deleting/destroying documents from their respective Alliance computers without authorization. (Compl., ¶¶ 52-53, 57-58). These allegations certainly are sufficient to state a claim against Carver and Thompson for Rule 12(b)(6) purposes. Defendants cite no cases suggesting otherwise.

To side-step this dispositive fact, Defendants observe that the Complaint does not explicitly allege that Carver and Thompson used a computer erasure program to permanently delete/destroy information from their Alliance computers. While this obvious observation is accurate, it ignores the fact that Alliance's only pleading obligation for CFAA purposes is to allege that Carver and Thompson permanently deleted/destroyed information from Alliance computers. It is not necessary to plead the precise manner in which they permanently

25

deleted/destroyed the information.  Again, Defendants cite no cases suggesting otherwise.[14] Accordingly, Alliance has properly pled a claim against Carver and Thompson under CFAA subsection (a)(5)(A)(i).

> ### c. The Complaint Adequately Pleads A Claim For Conspiracy To Violate The CFAA

Defendants' terse, legally-unsupported argument that the Complaint contains "no well-pleaded factual allegation" (Defs' Mem., at 24) of a CFAA conspiracy also merits little response. All that needs to be stated is that the Complaint explicitly alleges that (i) "Defendant Todd communicated and worked in concert with Carver and Thompson in devising a plan to access their respective Alliance computers without authorization, [and] delete all pertinent client-contact and other proprietary business information"; (ii) Carver and Thompson, "having decided to accept employment with Genesis, work[ed] in concert with the other Defendants, [and] accessed the Alliance computer issued to [them] her and deleted client information for all prospective clients and leads, as well as other proprietary business information"; and (iii) "Defendants had an agreement between themselves to intentionally and knowingly access their respective Alliance computers, without authorization, to delete all pertinent client-contact and other proprietary business information of Alliance from those computers[.]"  (Compl., ¶¶ 31, 52, 57, 74).

Given the above allegations, there is no question that Alliance has properly pled a CFAA conspiracy claim.

---

[14] As noted supra, Alliance's forensic investigation is ongoing and has not determined the precise manner in which Carver and Thompson permanently deleted/destroyed information from their Alliance computers.  In any event, Alliance clearly is entitled to use the discovery process to otherwise determine the manner in which Carver and Thompson permanently deleted/destroyed this information.

### 3. The Complaint Adequately Pleads A State-Law Claim For Conversion

Defendants' allege that Alliance cannot state a claim for conversion because "electronic data" constitutes "intangible property" that cannot be used to support a conversion claim. (Defs' Mem., at 24). Defendants are wrong, as evidenced by their failure to cite case-law specifically supporting their position.

In fact, courts have explicitly held that computer files and other electronic documents are tangible property that can be the subject of a conversion claim. See, e.g., Cole v. Control Data Corp., 947 F.2d 313 (8th Cir. 1991); Thyroff v. Nationwide Mutual Ins. Co., 864 N.E.2d 1272 (N.Y. 2007) ("[W]e believe that the tort of conversion must keep pace with the contemporary realities of widespread computer use. We therefore answer the certified question in the affirmative and hold . . . electronic records that are stored on a computer and were indistinguishable from printed documents . . . [are] subject to a claim of conversion."); Perk v. Vector Resources Group, Ltd., 253 Va. 310 (Va. 1997) (holding computer programs, data and software subject to conversion); National Surety Corp. v. Applied Systems, Inc., 418 So.2d 847 (Ala. 1982) (cited with approval by the Fourth Circuit in U.S. ex rel. Berge v. Board of Trustees of the University of Alabama, 104 F.3d 1453, 1464 (4th Cir. 1997)); Mundy v. Decker, 1999 WL 14479 (Neb. App. 1999)[15] (holding that WordPerfect files were "unique item[s] of personal property owned and controlled by [Plaintiff]" and were therefore the proper subject of a conversion claim); see also Nick Akerman, Conversion of E-Data, 30 Nat'l L. J. 12 (2007)[16] (noting the emergence of conversion as an alternative theory of recovery to the CFAA when computer data is stolen or destroyed.); Richard Raysman and Peter Brown, Electronic Records

---

[15] A copy of this unpublished opinion is attached hereto as Attachment A.
[16] A copy of the referenced article is attached hereto as Attachment A.

and the Tort of Conversion, 238 N.Y.L.J. 3 (2007)[17] (recognizing modern trend applying conversion to electronic content).

As the above legal authorities recognize, electronic documents are significantly more tangible – indeed, they can be easily converted to tangible documents simply by printing them or even imaging the content of a computer's hard drive - than the "business opportunities" and other less tangible property referenced by Defendants. That electronic documents constitute tangible property is further confirmed by the fact that the federal discovery rules now explicitly address the production of electronic information. See, e.g., Fed. R. Civ. P. 26. In sum, there is no question that Alliance has adequately pled a conversion claim.

## CONCLUSION

For all of the foregoing reasons, Defendants' Motion to dismiss should be denied in its entirety.

Dated this 23rd day of June, 2008.

Respectfully submitted,

/s/John D. Cole
*Attorney for Plaintiff*
Ogletree, Deakins, Nash, Smoak &Stewart, P.C.
201 S. College Street, Suite 2300
Charlotte, NC 28244
Tel: (704) 342-2588
Fax: (704) 342-4379
E-Mail: john.cole@ogletreedeakins.com
N.C. Bar No. 22573

---

[17] A copy of the referenced article is attached hereto as Attachment A.

/s/Michael L. Wade, Jr.
*Attorney for Plaintiff*
Ogletree, Deakins, Nash, Smoak &Stewart, P.C.
201 S. College Street, Suite 2300
Charlotte, NC 28244
Tel: (704) 342-2588
Fax: (704) 342-4379
E-Mail: michael.wade@ogletreedeakins.com
N.C. Bar No. 33520

## CERTIFICATE OF SERVICE

I, John D. Cole, hereby certify that I have this day filed a copy of the foregoing

**RESPONSE TO DEFENDANTS' MOTION TO DISMISS** with the Clerk of Court using the

CM/ECF system, which will send notification of such filing to the following persons:

> Todd Sullivan, Esq.
> Mark Sigmon, Esq.
> Womble Carlyle Sandridge & Rice, PLLC
> 150 Fayetteville Street, Suite 2100
> Raleigh, North Carolina 27602
> Telephone: (919) 755-2119
> Facsimile: (919) 755-6160
> Email: tsullivan@wcsr.com

> *Attorneys for Defendants*

Dated this the 23rd day of June, 2008.

> /s/John D. Cole
> *Attorney for Plaintiff*
> Ogletree, Deakins, Nash, Smoak &Stewart, P.C.
> 201 S. College Street, Suite 2300
> Charlotte, NC 28244
> Tel: (704) 342-2588
> Fax: (704) 342-4379
> E-Mail: john.cole@ogletreedeakins.com
> N.C. Bar No. 22573

> /s/Michael L. Wade, Jr.
> *Attorney for Plaintiff*
> Ogletree, Deakins, Nash, Smoak &Stewart, P.C.
> 201 S. College Street, Suite 2300
> Charlotte, NC 28244
> Tel: (704) 342-2588
> Fax: (704) 342-4379
> E-Mail: michael.wade@ogletreedeakins.com
> N.C. Bar No. 33520